IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| VICTORIA JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CV 006-436-EJL |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| NORTH IDAHO COLLEGE, an Idaho | ) | |
| Corporation, and DONALD FRIIS, an | ) | |
| Individual, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

## REPORT

The Court has before it Defendant Northern Idaho College's Motion for Summary Judgment (Docket No. 49) and Defendant Donald Friis' Motion for Summary Judgment (Docket No. 51). Having carefully reviewed the briefing submitted by the parties and the record, as well as holding oral argument on the motions, the Court recommends, for the following reasons, that both NIC's and Donald Friis' Motions be granted.

## I.

### Background

**A.     Statement of Facts**

The basis of this lawsuit is the alleged sexual harassment of Plaintiff Victoria Johnson ("Johnson") by Defendant Donald Friis ("Friis") , a professor at Defendant North Idaho College ("NIC"). Johnson, a non traditional student at age 44, began attending NIC in the Fall of 2001. The alleged sexual harassment began that Fall when Johnson was enrolled in Friis' introductory computer class. Plaintiff's Statement of Material Facts, Docket No. 64, ¶1. Johnson alleges that, during this computer class, Friis flirted with her and generally acted inappropriately toward her. *Id.* At one time during the semester, Friis asked Johnson and another female student to

**REPORT AND RECOMMENDATION - 1**

breakfast and then inquired about Johnson's dating situation.   Johnson replied she was not interested in dating anyone.   Johnson alleges that, after this incident, Friis treated her negatively, degrading and humiliating her.  Affidavit of Bruce J. Castleton, Docket No. 49-4, Ex. A., p. 113:6 -114:1-22.[1]  She further alleges that Friis indicated her grade would be affected by her response to his actions.[2]  According to  Johnson, this behavior forced her to withdraw from his class.[3]

Following the Fall 2001 semester, Johnson lost her financial aid because she failed to complete the required number of classes during the semester.[4]  Aff. Castleton, Docket No. 49-4. Ex. A, p. 127:2-11.  Johnson met with Judy Bundy, her counselor at NIC, to discuss her options. At this meeting, Johnson told Ms. Bundy that  Friis made her uncomfortable. Aff. Castleton, Docket No. 49-4, p. 128:21-133:6.  In addition to Ms. Bundy, Johnson only communicated her problems with Friis to a few other people during that semester, none of whom was employed by NIC.[5]  Over the next few years,  Johnson saw  Friis only once, at a restaurant where she was working.  Aff. Castleton, Docket No. 49-4, p. 101:2-16.

In January of 2004,  Johnson met with Judy Beckendorf, an academic advisor at NIC to get enrolled for the Spring 2004 semester.  Aff. Castleton, Docket No. 49-4, p. 145:25-146:7. Beckendorf suggested to Johnson she needed to complete the introductory computer class.  After Johnson inquired and discovered that the only open section was taught by  Friis, she did not

---

[1] In the citations to Exhibit A of Mr. Castleton's Affidavit, the Court will cite to the page and line of Johnson's deposition testimony rather than to the page number of the Affidavit in its entirety.  All of the page citations are to Volume 1 of Johnson's deposition unless identified as Volume 2 ("Vol. 2").

[2] In her deposition testimony, Johnson stated that this was just a feeling, as Friis never communicated this to her.  Aff. Castleton, Docket No. 49-4, Ex. A, p. 116:7-117:2.

[3]  Whether this was the only reason Johnson withdrew from the class is contested, as Johnson had several other personal challenges during that semester, including working late, dealing with an ill mother, a sprained ankle, and suffering a burglary. She testified that these did not effect her too much; however, she also noted that she was feeling depressed like she needed to withdraw. Aff. Castleton, Docket No. 49-4, Ex. A, p. 120:4-126:14.

[4]  Johnson places focus on the emotional impact of Friis' alleged sexual harassment as delaying the completion of her studies and accounting for the decline in her grades. Aff. Castleton, Docket 49-4, Ex. A , p. 143:2-12.

[5]  Around the Fall of 2001, Johnson also told her friends and her employer. Aff. Castleton, Docket No. 49-4, Ex. A, p. 127:12-129:5.

**REPORT AND RECOMMENDATION - 2**

inform Ms. Beckendorf why she did not want to take the class from Friis.  Instead, she decided to take the class, hoping his behavior would improve. Plaintiff's Statement of Material Facts, Docket No. 64, ¶¶2-3.  According to  Johnson, this was not the case. Plaintiff's Statement of Material Facts, Docket No. 64, ¶3. Instead, Friis' alleged inappropriate behavior persisted during the Spring of 2004, with Friis being overly nice to Johnson, flirting, and inappropriately touching her.  Aff. Castleton, Docket 49-4, Ex. A, p. 151:12-152:12.

During the Spring 2004 semester, Johnson hired Sharon Olson, Friis' teaching assistant, as a tutor.  Aff. Castleton, Docket No. 49-4, Ex. A, p. 165:24-166:3.  She told Ms. Olson Friis made her uncomfortable and they discussed another situation[6] with Friis, but Johnson did not tell Ms. Olson that she believed Friis was sexually harassing her.  Aff. Castleton, Docket No. 49-4, Ex. A, p. 166:3-24. Johnson did not tell anyone else about Friis' actions during the Spring and Summer of 2004. Aff. Castleton, Docket No. 49-4, Ex. A, p. 181:3-7.

After the midterm of the Spring 2004 semester, Johnson stopped attending class and did not complete any assignments, and Johnson asked Friis to allow her to receive an incomplete grade. Aff. Castleton, Docket No. 49-4, Ex. A, p. 173:17-174:11.  Friis agreed, even though Johnson had not completed class work and had a D- at the midterm. Aff. Castleton, Docket No. 49-4, Ex. D.  Johnson never completed the course work and under NIC policy, her incomplete automatically changed to an F. Aff. Castleton, Docket No. 49-4, Ex. E, p. NIC 51.

Johnson alleges Friis contacted her several times over the Summer of 2004, while her grade was still pending, asking her out on dates and leaving her inappropriate messages. Plaintiff's Statement of Material Facts, Docket No. 64, ¶3.  However, after Johnson told Friis that his requests were unethical and she did not want a personal relationship,  Friis stopped communicating with her. Aff. Castleton, Docket No. 49-4, Ex. A, p. 176:13-17.

It was not until January of 2005 that Johnson discussed the alleged sexual harassment by Friis with Ms. Bundy. Aff. Castleton, Docket No. 49-4, Ex. A, p. 182:8-15. Johnson met with

---

[6] In Johnson's deposition, she testified she discussed a fit Friis allegedly threw in class with Ms. Olson. Aff. Castleton, Docket No. 49-4, Ex. A, p. 179:22-180:9.

**REPORT AND RECOMMENDATION - 3**

Ms. Bundy to discuss enrolling at NIC for the Spring 2005 semester.  It was at this meeting that Johnson discovered her incomplete grade had automatically converted to an F.  Johnson believed this grade was in retaliation for her not going out with Friis over the summer, and so she then told Ms. Bundy about Friis' behavior.[7] Aff. Castleton, Docket No. 49-4, Ex. A, p. 184:12- 185:12-19.

In response, Ms. Bundy told Johnson that she, Ms. Bundy, was obligated to report the behavior to NIC.  Ms. Bundy contacted Brenda Smith, NIC's affirmative action officer charged with receiving reports of sexual harassment. Affidavit of Brenda Smith, Docket No. 49-5, ¶3. Smith met with Johnson, informing her she could make a formal complaint, and Johnson filed her formal complaint in February 2005. Aff. Smith, Docket No. 49-5, ¶5. After receiving the complaint, Smith followed NIC policy, informing Friis' of the allegations and giving him an opportunity to respond.  Smith then convened NIC's Sexual Harassment Advisory Committee (SHAC) to investigate the allegations. Aff. Smith, Docket No. 49-5, ¶¶5-6. The SHAC determined that Friis had violated the NIC sexual harassment policy by asking Johnson out on dates while he still controlled her grade in the computer class and recommended the strongest possible sanction, eventually offering him the opportunity to resign in lieu of termination.  The SHAC also determined that no grade retaliation had taken place. Aff. Smith, Docket No. 49-5, Ex. C.  Friis resigned from his position in June 2005.  Aff. Smith, Docket No. 49-5, ¶10.

In May of 2005, Johnson filed an administrative complaint with the Idaho Human Rights Commission ("IHRC") alleging discrimination against NIC.  Johnson then filed her Complaint within the ninety (90) day right to sue period in the District Court for the First Judicial District for the State of Idaho, Kootenai County, which was removed to this Court based on federal question jurisdiction. (Docket No. 1).  The Complaint included several claims against both NIC and Friis, including Negligent Supervision/Hiring/Retention against NIC and Sexual Harassment, Negligent and Intentional Infliction of Emotional Distress, Gender Discrimination in Violation of

---

[7] In Johnson's deposition, she testified that she now believes her grade was changed because she did not finish the class work within a certain amount of time.  Aff. Castleton, Docket No. 49-4, Ex. A, p. 185:3-11.

**REPORT AND RECOMMENDATION - 4**

Title IX and the Idaho Human Rights Act (IHRA), Assault and Battery, and punitive damages against Friis and NIC as Friis' employer. (Docket No. 25).  Defendant NIC's and Friis' motion to dismiss all tort allegations in the Complaint was granted (Docket No. 27) based on Johnson's failure to satisfy the notice requirements of the Idaho Tort Claims Act.   NIC and  Friis both filed motions for summary judgment on the Title IX and IHRA claims, and these motions are addressed in this Report and Recommendation.

**II.**

**Discussion**

**A.     Legal Standard**

Motions for summary judgment are governed by Fed. R. Civ. P. 56.  Rule 56 provides in pertinent part that judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

A moving party who does not bear the burden of proof at trial may show that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party meets the requirement of Rule 56 by either showing that no genuine issue of material fact remains or that there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  It is not enough for the [non-moving] party to "rest on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256.  Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.  "When determining if a genuine factual issue . . . exists, . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Id.* at 254.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

In determining whether a material fact exists, facts and inferences must be viewed most favorably to the non-moving party. To deny the motion, the Court need only conclude that a result other than that proposed by the moving party is possible under the facts and applicable law. *Aronsen v. Crown Zellerbach,* 662 F.2d 584, 591(9th Cir. 1981). However, the Ninth Circuit has emphasized that summary judgment may not be avoided merely because there is some purported factual dispute, but only when there is a "genuine issue of material fact." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir. 1992). The Ninth Circuit has found that, to resist a motion for summary judgment,

> the non-moving party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. Ltd. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

## B.   Defendant NIC's Motion for Summary Judgment

NIC contends that summary judgment should be granted in its favor because Plaintiff has not and cannot meet the required elements of a claim under Title IX of the Education Amendments of the Civil Rights Act of 1964 ("Title IX"). 20 U.S.C. §1681 *et seq.* Specifically, NIC argues that summary judgment is warranted because Johnson did not provide actual notice to an appropriate person at NIC regarding the alleged actions of Friis until she met with Ms. Bundy in January of 2005. Ms. Bundy then reported the alleged sexual harassment to Ms. Smith, the NIC affirmative action officer. NIC further alleges that the actions taken by NIC after becoming aware of the alleged sexual harassment were in accord with NIC policies and procedures and were not deliberately indifferent. Johnson's response focuses on the proposition

that NIC had knowledge of a substantial risk that Friis was sexually harassing students prior to Johnson's meetings with Ms. Bundy and Ms. Smith in 2005, and this knowledge of a substantial risk is enough to satisfy the actual notice requirement under Title IX.  Johnson further alleges that there exist genuine issues of material fact as to whether NIC acted with deliberate indifference.

### 1.    Statute of Limitations on claims for Fall 2001 semester events

NIC argues that any Title IX claim based on the events that took place in 2001 is time barred by a two year statute of limitations.  Under Title IX, courts borrow the applicable state statute of limitations for personal injury actions.  *Stanley v. Trustees of Calif. State Univ.,* 433 F.3d 1129, 1134-1135 (9th Cir. 2006).  Idaho's statute of limitations is two years for personal injury actions.  I.C. §5-219(4).  However, federal law governs the determination "of the point at which the limitations period begins to run."  *Id. citing Hoesterey v. City of Cathedral City*, 945 F.2d 317, 319 (1991).  "The touchstone for determining the commencement of the limitations period is notice: 'a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action.'"  *Id*.  (Internal citations omitted).

In the instant case, it is difficult to determine whether Johnson is claiming *quid pro quo* or hostile environment sexual harassment, and the standards relating to the statute of limitations under each are different.   However, the Court does not need to determine which type of sexual harassment she is claiming, as the events in 2001 are barred by the statute of limitations under both standards.

For a *quid pro quo* sexual harassment action to be timely, the discrete actions upon which the claim is based must occur within the statute of limitations. *Stanley*, 433 F.3d at 1136.  Therefore, because the events in 2001 occurred well before two years prior to Johnson's filing her lawsuit, any *quid pro quo* claim based on any discrete act in 2001 is time barred by the statute of limitations.  Regarding a hostile environment claim, the continuing violations doctrine applies and "the employee need only file a charge within... [the limitations period] of any act that is part of the hostile work environment." *Stanley*, 433 F.3d at 1136 *citing Nat'l. R.R. Passenger Corp. v.*

**REPORT AND RECOMMENDATION - 7**

*Morgan*, 534 U.S. 101, 118, 122 S. Ct. 2061 (2002).[8]  The *Morgan* decision further explained that, as long as the acts were part of one "unlawful employment practice" and one of those acts occurred prior to the running of the statute of limitations, the previous acts would also be included, unless the later acts had no relation to the prior acts, or for some other reason were no longer part of the same hostile environment claim. *Id*.

In the present case, the continuing violation doctrine does not apply because the two partial semesters Johnson spent in Friis' class are too distinct in time to be considered part of the same alleged unlawful act or hostile environment.  Additionally, Johnson intervened by withdrawing herself from the class in 2001 and not deciding to return to Friis' class until over two full years had passed without a single alleged discriminatory incident.  Therefore, the Court finds that  Johnson knew of her hostile environment claim against Friis based on his 2001 actions in 2001 when she withdrew from the class, and therefore, the two year statute of limitations has expired and  Johnson's current claim proceeds only upon the events that occurred in 2004 or later.

### 2.      NIC's Motion for Summary Judgment on the Title IX Claim

Title IX of the Education Amendments to the Civil Rights Act of 1964 provides : "No person shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. 20 U.S.C. §1681(a).  Although the statute calls for a direct administrative enforcement scheme, Title IX also is enforceable through an implied private right of action. [9] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), *citing Cannon v. University of Chicago*, 441 U.S. 677 (1992); *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, (1992).  Moreover, sexual harassment of a student by an educator constitutes actionable

---

[8] In *Stanley*, the Ninth Circuit applied the guidelines established by the United States Supreme Court in *Morgan*, a Title VII action, to the Title IX action before it.  The United States Supreme Court recently reaffirmed the *Morgan* decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S.Ct. 2162 (2007).

[9] Monetary damages are available if liability is proven for the implied private cause of action.

**REPORT AND RECOMMENDATION - 8**

discrimination under Title IX. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60,75 (1992).

However, the Supreme Court of the United States has explicitly declined to impose liability on the institution in teacher-student sexual harassment cases based on vicarious liability, *respondeat superior,* or constructive notice. *Gebser*, 524 U.S. at 285. Instead, the Court held a private cause of action for damages under Title IX cannot be maintained against an educational institution receiving federal funds, unless "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipients behalf[10] has actual knowledge of discrimination in the recipients program and fails to adequately respond." *Gebser,* 524 U.S. at 291. The Court further explained that the inadequate response by the educational institution must amount to deliberate indifference to discrimination. *Id.*

Based on the aforementioned legal principles, for Johnson's Title IX claim against NIC to survive summary judgment, Johnson needs to offer sufficient evidence that: 1) she was subjected to *quid pro quo* sexual harassment or a sexually hostile educational environment; 2) an employee of NIC with the authority to correct the wrongdoing had actual notice of the discrimination; and 3) NIC acted with deliberate indifference to the discrimination.

### 3.     Sexual Harassment

Neither party addressed the first element, as to whether Friis' actions constituted either *quid pro quo* or hostile environment sexual harassment, in their original briefing. Instead, the first mention of this element in the briefing comes in NIC's Reply. Docket No. 69, p.13. In that Reply, NIC argues that this element needs to be reconsidered in light of Johnson's admission in her Response (Docket No. 62) that several of Friis' alleged actions occurred off campus and after hours and therefore were not within the course and scope of Friis' employment. NIC argues that these actions of Friis should not be considered in determining NIC's liability, if any, under Title IX because only the actions taken by Friis within the course and scope of his employment can be

---

[10] This is how the U.S. Supreme Court defined an "appropriate person." *Gebser*, 524 U.S. at 290.

**REPORT AND RECOMMENDATION - 9**

the basis of NIC's liability, and the actions taken in the course and scope of his employment do not add up to sexual harassment.  Although the Court interprets Johnson as claiming hostile environment harassment as opposed to *quid pro quo* harassment, the Court does not need to address this issue as summary judgment, as explained below, is warranted on other grounds.

### 4.     Actual Notice

As previously noted, for a damages claim under Title IX to lie, an appropriate person at the educational institution must have been given actual notice.  Whether actual notice exists is a matter of fact, but it can be resolved as a matter of law where the facts are undisputed. *Doe v. Dallas Indep. Sch. Dist*, 220 F.3d 380, 384-5 (5th Cir. 2000).  Neither the Ninth Circuit nor the United States Supreme Court has directly addressed what constitutes actual notice under *Gebser*;[11] however, the issue has been addressed by numerous courts and two different positions have emerged.

Some courts have held that, to satisfy the actual notice requirement, the educational institution must have actual knowledge of the employee's specific misconduct complained of by the plaintiff. *Johnson v. Clovis Unified Sch. Dist.*, 2007 WL 1456062 at 3 (E.D. Cal. 2007).  The Fourth Circuit has adopted this rule, interpreting the requirement as necessitating  "a showing that school district officials possessed actual knowledge of the discriminatory conduct in question." *Baynard v. Malone*, 268 F.3d 228, 237-238 (4th Cir. 2001).

In *Baynard*, the Fourth Circuit held that, while a principal should have been aware of a potential for abuse by a teacher based on reports from other students, the institution could not be held liable because the principal was not aware that the student-plaintiff was being abused. *Id.* This is similar to the holding in *Gebser*, where the Supreme Court of the United States held that a complaint from the parents of other students that the teacher had made inappropriate sexually suggestive comments during class was "plainly insufficient to alert the principal to the possibility

---

[11] However, by eliminating the possibility of constructive notice, the United States Supreme Court in *Gebser* intended actual notice to mean actual notice of the discrimination against the plaintiff.

**REPORT AND RECOMMENDATION - 10**

that the teacher was involved in a sexual relationship with a student." *Gebser*, 524 US at 291.

Adopting a similar approach, the Eleventh Circuit in *Davis v. Dekalb* held that a complaint by a

parent about a slight touching during a football league and a perceived imminent touching could

not, as a matter of law, constitute actual notice.  *Davis*, 233 F.3d at 1373.  In reaching this

conclusion, the court considered testimony by the teacher's superior that nothing about sexual

misconduct was ever communicated to him with regard to the student's complaint.  *Id.* at n. 10.

Finally, and most similar to the case at hand, the Tenth Circuit recently held that a learning

disabled female high school student telling a counselor that "boys are bothering me and no one

understands me in town" was insufficient to alert the counselor or the school that boys were

coercing the female student into performing various sexual acts.  *Rost ex rel. K.C. v. Steamboat

Springs RE-2 School Dist.*,  511 F.3d 1114 (10th Cir. 2008)

 Other courts have moved toward a more lenient interpretation of actual notice, holding

that knowledge of a substantial risk of harassment (hereinafter "risk notice") is enough to satisfy

the actual notice requirement, as opposed to actual notice of harassment of the specific plaintiff-

student. *See Doe v. Green*, 298 F.Supp.2d 1025, 1034 (D.Nev.2004), *Aguilar v. Corral,* 2007

WL 2947557 (E.D.Ca. 2007).   As described by the Southern District of Iowa and adopted by

both the Nevada and the Eastern California District Courts, the parameters of the rule can be

expressed as follows:  "actual notice 'requires more than a simple report of inappropriate

conduct' on the part of a school employee but 'the....standard does not set the bar so high that a

school district is not put on notice until it receives a clearly credible report of sexual abuse from

the plaintiff-student." *Doe v. Green*, 298 F.Supp.2d 1025, 1034 (D.Nev.2004) citing 15

F.Supp.2d 1077, 1082 (S.D.Iowa 2000) (*internal citations omitted)*;  *see also Aguilar,* 2007 WL

2947557.   In other words, "[t]he institution must have possessed enough knowledge of the

harassment that it reasonably could have responded with remedial measures to address the kind

of harassment upon which plaintiff's legal claim is based." *Id . citing Crandell v. New York

College of Osteopathic Med.*, 87 F. Supp.2d 304, 320 (S.D.N.Y. 2000).

When applying the risk notice standard, courts have held that prior complaints made by either the same or other students can constitute actual notice. *Johnson v. Galen Health Institutes, Inc.*, 267 F. Supp.2d 679, 699 (W.D.Ky. 2003); *see also Doe v. Green*, 298 F.Supp.2d 1025. Despite this general rule, courts have made several observations about what type of prior complaints can give rise to notice of a substantial risk. For example, in *Johnson v. Galen Health Institutes,* the Court held that the *Gebser* opinion does not require perfect correspondence between the type of notice the school official received and the type of discrimination complained of, but there must be a more stringent correlation than under the facts presented. *Id.* In that case, where *quid pro quo* harassment was alleged, notice of a tendency to create a sexually offensive environment provided through complaints of other students was held to be insufficient to constitute notice of a tendency to sexually proposition a student, and summary judgment was granted in the defendant's favor. *Id. At* 689. Similarly, the Eastern District of California noted that reports of sexual harassment that would constitute substantial risk notice must be "of the kind of harassment upon which the plaintiff's legal claims are based." *Auguilar*, 2007 WL at 6. In *Aguilar*, the Court described other factors to consider when determining whether complaints by other students constituted actual notice, including whether the complaints were sufficiently numerous, severe, or close in time to the instances of discrimination alleged by the plaintiff. *Id* at 7.

Under both standards regarding actual notice discussed above, summary judgment is appropriate in favor of NIC. Therefore, the Court does not need to adopt one or the other for purposes of resolving Defendant NIC's motion for summary judgment.

Under the stricter actual notice standard proposed by NIC, it is clear that NIC did not have actual notice of Friis' actions that led Johnson to believe she was the victim of sexual harassment until the January 2005 conversation Johnson had with Ms. Bundy. Even Johnson does not contest this conclusion, focusing her argument instead on application of the less stringent risk notice standard. Johnson's prior conversations with Ms. Bundy and Ms. Olson in

2004 do not fulfill the actual notice requirement, given that Johnson's communications with Ms. Bundy, her counselor, and with Ms. Olson, her student teacher, were too vague to put either of them or NIC on notice that Johnson was being sexually harassed by Friis.  A comment made by a student that her professor makes her "uncomfortable," without more detail, cannot be equated to a complaint of sexual harassment.  This conclusion is consistent with the facts in *Davis v. Dekalb*, where, even faced with several complaints of inappropriate sexual comments in class, the principal was not deemed to have actual notice because the student never mentioned sexual misconduct.

Application of Johnson's proposed risk notice standard yields the same result.   Johnson bases her argument that knowledge of a substantial risk existed on two events: 1) a prior informal complaint received by Brenda Smith, NIC's affirmative action coordinator, during a conversation with a male student who informed her that Friis invaded his space and made him feel uncomfortable; and 2) a report by NIC staff that  Friis was engaging in inappropriate touching of female students in April 2005 <u>after</u> Johnson had filed her formal complaint and while the investigation was pending. Plaintiff's Response, Docket No. 63, p. 6. NIC replied that, even if the Court adopted the risk notice theory, neither of the above mentioned events satisfy the notice of a substantial risk standard.  The Court agrees.

The male student's comment to Ms. Smith that Friis had invaded his personal space and made him feel uncomfortable was inadequate to put NIC on notice for several reasons. First, Ms. Smith testified in her affidavit that she ultimately concluded that this conduct by Friis did not constitute sexual harassment, and thus it could not have given NIC notice that there was a substantial risk that Friis was sexually harassing students.  Aff. Smith, Docket No. 49-5, ¶14 Additionally, under the *Aguilar* and *Johnson v. Galen Health Institute* standard requiring stringent correlation between the type of conduct the institution has notice of and the kind of harassment complained of by the plaintiff, it is logical to conclude that a complaint by a male student that Friis was invading his space does not put NIC on notice that there was a substantial

risk that Friis was sexually harassing female students by asking them out and touching them inappropriately.  Therefore, the Court concludes as a matter of law that NIC did not have actual notice or risk notice until January 2005 when Ms. Johnson informed Ms. Bundy about Friis specific actions towards her.

Second, NIC argues that the events documented and witnessed after the formal complaint was filed by Johnson in February 2005 are not relevant to determination of the issue at hand. The Court agrees.  If Johnson had not yet filed the formal complaint, these instances would need to be taken into account in examining the actual notice requirement; however, given they occurred after NIC already had actual notice under either theory, the only element they may pertain to is deliberate indifference.

### 5.    Deliberate Indifference

If Johnson makes a sufficient showing that an appropriate person had actual notice of the discrimination, she must further demonstrate that the educational institution acted with deliberate indifference once it had actual notice of the discrimination.  The deliberate indifference standard requires the Court to "decide whether a reasonable fact finder could conclude that the College's response was 'clearly unreasonable in light of the known circumstances.'" *Oden v. Northern Marianas College*, 440 F.3d 1085, 1089 (9th Cir. 2006) *citing Davis v. Monroe County Bd. Of Ed.* 526 US 629, 641 (1999). The underlying purpose of this stringent standard is to prevent the diversion and expenditure of public educational funds through imputation of wrongdoing and to impose liability only where the school system had an opportunity to take action to end or limit the sexual harassment and failed to do so.  *Gebser*, 524 US at 289.

Based on this underlying policy, many Courts, including the Ninth Circuit, have interpreted this strict standard to require "an official decision ... not to remedy the violation" to prove deliberate indifference. *Gebser*, 524 U.S. at 290; *Oden*, 440 F.3d 1089. If the school system acts in a timely and reasonable manner to end the harassment, it will not be liable under Title IX. *Wills v. Brown University*, 184 F.3d 20, 26 (1st Cir. 1999) *citing Gebser* at 1997-1999.

**REPORT AND RECOMMENDATION - 14**

Finally, "in an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 US at 649.

Johnson alleges that NIC acted with deliberate indifference after receiving actual notice in January 2005. The Court disagrees.  Instead of making an official decision to take no action, NIC, upon receipt of Johnson's formal complaint, followed its policies and procedures.  It immediately notified Friis of the complaint and his opportunity to respond, and once his response was received, NIC convened the Sexual Harassment Advisory Committee and conducted an investigation into the matter.  This conclusion is bolstered by the fact that, under NIC's policy, Johnson's complaint was untimely but NIC still conducted a full investigation.  Johnson contends this could still constitute deliberate indifference because NIC failed to monitor Friis after the formal complaint was received.  Again, the Court disagrees.  Title IX requires that the educational institution act reasonably.  It does not require certain specific actions by the educational institution such as monitoring a professor after a complaint is received, especially if the educational institution has no prior notice or contentions of imminent harmful conduct. Therefore, the Court concludes as a matter of law that NIC did not act with deliberate indifference because it did not act "clearly unreasonably" in light of the known circumstances. *See Davis*, 526 US at 649.

Even if the complaint by the male student prior to Johnson's formal complaint was enough to constitute notice that Friis was a substantial risk of harm, Johnson has failed to demonstrate that NIC acted with deliberate indifference at that time or at the time of receiving her complaint.  Instead of taking no action, Ms. Smith talked to Friis and determined he needed sensitivity training, which he attended. Aff. Smith, Docket No. 49-5,¶ 14. In light of the nature of the male student's complaint, this response was not clearly unreasonable.  Instead of constituting an official decision not to act, it demonstrates an effort by NIC to remedy the problem the male student was having with Mr. Friis.  Therefore, even if the complaint fulfills the risk notice

requirement, NIC did not act with deliberate indifference and summary judgment would still be appropriate in NIC's favor.

### 6.    Idaho Human Rights Act Claim, I.C. §67-5901 *et seq*.

In Johnson's Amended Complaint, she asserts a cause of action against NIC under the Idaho Human Rights Act,  I.C. §67-5901 *et seq*., ("IHRA") based on the same facts as her Title IX claim.  NIC has moved for summary judgment, arguing that the IHRA claim should be analyzed under the federal Title IX standard and fail on the same grounds.  Johnson argues that the IHRA claim is different than Title IX and should be analyzed under a different standard, such as the Title VII of the Civil Rights Act of 1964, 42 §U.S.C. 2000e *et seq.,* ("Title VII") standard, because the IHRA allows for *respondeat superior* liability.  Johnson bases this argument on the definition of "educational institution" in the IHRA which includes the word "agent." I.C. §67-5902(10). Thus, she argues that because Title VII includes the word agent and recognizes *respondeat superior* liability, the IHRA as it relates to the liability of educational institutions does as well.  NIC replies that recognition of *respondeat superior* liability would conflict with Idaho law and the purposes of Title IX; and, even if *respondeat superior* liability is available, it is inappropriate in this case because Friis was not an agent of NIC and was not acting within the scope of his employment at the time of the alleged sexual harassment.  Here, the question regarding which standard to apply is a matter of statutory construction.

In Idaho, when construing a statute, the focus of the Court is to give effect to the intent of the Legislature.  *In re Daniel W. v. Kootenai Hospital District,* 145 Idaho 677, 183 P.3d 765 (2008) *citing George W. Watkins Family v. Messenger*, 140 Idaho 796, 798, 102 P.3d 1115, 1117 (2004).  The goal is "'to give effect to the purpose of the statute and the legislative intent enacting it, which may be implied from the language used or inferred on grounds of policy or reasonableness.'" *State v. Hickman*, 2008 WL 1837505, (2008) *citing The Senator, Inc. v. Ada County, Bd. Of Equalization,* 138 Idaho 566, 570, 67 P.3d 45, 49 (2003).   Statutory interpretation begins by examining the plain language in the statute. *In re Daniel W,* 183 P.3d at

768 *citing State v. Burnight,* 132 Idaho 654, 659, 978 P.2d 214, 219 (1999).   Where the language

is unambiguous, it must be given its plain, obvious, and rational meaning.  *Id.*  However, where

the language of the statute is ambiguous, absurd, incomplete, or arguably in conflict with other

laws, the Court looks to rules of construction for guidance.  *State v. Yager,* 139 Idaho 680, 689,

85 P.3d 656, 665 (2004).  To ascertain the intent of the Legislature, not only must the literal

words of the statute be examined, but also the context of those words, the public policy behind

the statute, and its legislative history.  *Id. citing State v. Rhode*, 133 Idaho 459, 462, 988 P.2d

685, 688 (1999).  Constructions that would lead to absurd or unreasonably harsh results are

disfavored. *Id., citing Gavica v. Hanson*, 101 Idaho 58, 60, 608 P.2d 861, 863 (1980).

 The statute requiring interpretation in the instant case is the IHRA.  In examining the

statute, the Court finds that the policy of the IHRA is in conflict with the plain language of the

IHRA, and therefore statutory construction is necessary.  The general purpose of the IHRA is "to

provide for execution within the state of the policies embodied in the federal Civil Rights Act of

1964..." I.C. §67-5901.  In light of this purpose, the Idaho Supreme Court looks to federal law for

guidance in interpreting the statute and determining the appropriate claims under the IHRA.

*Jeremiah v. Yanke Machine Shop, Inc.*, 131 Idaho 242, 249, 952 P.2d 992, 999 (1998);  *Fowler v.*

*Kootenai County*, 128 Idaho 740, 743, 918 P.2d 1185, 1188 (1996). Further, the IHRA generally

prohibits discrimination on the basis of sex by an educational institution, providing that:

> [s]hall be a prohibited act to discrimination against a person because of, or on a
> basis of, race, color, religion, sex or national origin, in any of the following
> subsections.... (7) For an educational institution: a) to exclude, expel, limit, or
> otherwise discriminate against an individual seeking admission as a student or an
> individual enrolled as a student in the terms, conditions, and privileges of the
> institution... I.C. §67-5909.

An "educational institution" is defined as a "public or private institution....and includes an agent

of an educational institution." IC §67-5902(10).  This restriction is similar to the federal

restriction on discrimination by educational institutions contained in Title IX of the Civil Rights

Act of 1964, as amended, which defines an "educational institution" as "any public or private...

preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department."  20 U.S.C. §1681(c).

As noted above, Johnson contends that the inclusion of "agent" in the definition of educational institution under the IHRA distinguishes it from Title IX and indicates that NIC could be liable for Friis' actions based on the theory of *respondeat superior*.  This contention is grounded in case law interpreting Title VII - specifically a Ninth Circuit decision holding that "agent" in defining employer for Title VII purposes was clearly intended to create *respondeat superior* liability in the statute.  *Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587 (9th Cir. 1993).

Applying the rules of statutory construction discussed above, the Court must first look to the specific language of the statute to determine if there is an ambiguity.  Here the Court finds there is a latent ambiguity,[12] as the inclusion of the word "agent" is in conflict with the policy provision instructing the Court to implement the policies of the Civil Rights Act, as amended.  Thus, the Court must engage in statutory construction to determine the intent of the Legislature.  When doing so, the Court finds that the Legislature clearly intended the IHRA follow federal guidance in dealing with educational institution discrimination and thus, the Title IX standard should apply.

First, in implementing the IHRA, the Legislature intended to parallel the causes of action under the Civil Rights Act of 1964, as amended, as is stated in the first section of the IHRA. This is consistent with the Idaho Supreme Court's application of the standards developed under Title VII for employment discrimination claims to employment discrimination claims filed under the IHRA. *See Yeargain v. Landry*, Slip Copy 2008 WL 314414 (D. Idaho Feb. 4, 2008); see also

---

[12] An ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed.  BLACKS LAW DICTIONARY 2D (2001).

*Foster v. Shore Club Lodge*, 127 Idaho 921, 908 P.2d 1228 (1995). Following the same reasoning, the Court should apply the standards developed to address educational discrimination claims under federal law to educational discrimination claims filed under the IHRA.  This conclusion is also consistent with the timing of the implementation of the IHRA. The IHRA, including the definition of educational institution, was adopted prior to the United States Supreme Court's 1998 *Gebser* decision which established the modern framework for Title IX claims.  Prior to *Gebser*, a claim under Title IX was frequently analogized to employment discrimination claim brought under Title VII.  However, the *Gebser* decision eliminated the need to borrow from employment discrimination law in addressing vicarious liability under Title IX.[13] Therefore, the Court finds it would be unreasonable to apply a body of law dealing with employment discrimination claims to an educational discrimination claim  when a framework for education discrimination has been established by the United States Supreme Court. Thus, the Court finds the Title IX standard applies to Johnson's claims under the IHRA.

7.      **Applying Title IX standard**

Applying the Title IX standard to NIC's motion for summary judgment on Johnson's claim under the IHRA, the conclusion is the same as above.  Johnson has failed to demonstrate, under the *Gebser* framework, that NIC had actual notice of the discrimination, under both the actual notice and risk notice standards, and Johnson has failed to demonstrate that NIC acted indifferently when it received actual notice.  Therefore, no genuine issue of material fact exists and summary judgment in favor of NIC on the IHRA claim is appropriate.

**C.     Friis' Motion For Summary Judgment**

Donald Friis is seeking summary judgment on the IHRA and the Title IX claims based on the argument that, as an individual, he cannot be held liable under either of these statutes.

---

[13] This conclusion is also supported by the United States Supreme Court's adoption of the modern framework for Title VII cases during the same month and year (June 1998) in *Faragher v. City of Boca Raton*, and *Ellerth v. Burlington Industries*. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Ellerth v. Burlington Industries, Inc.* 524 U.S. 742, 765 (1998).

**REPORT AND RECOMMENDATION - 19**

Johnson does not respond to these claims and the Court agrees with Friis' arguments.

The statutory language and case law regarding Title IX clearly advise that only the institution or the program has liability for Title IX violations.  *Doe v. Petaluma City Sch. Dist*. 830 F. Supp. 150, 1576; *Smith v. Metropolitan school Dist. Perry Tp*., 128 F.3d 1014, 1018-1021 (7th Cir. 1997).  Therefore the Court holds Mr. Friis can not be held individually liable under Title IX.

Additionally, based on the discussion above applying the Title IX standard for educational discrimination claims under the IHRA, the Court, seeing no reason why the IHRA would differ from Title IX in this respect, agrees with Friis' assertion that the IHRA also does not provide for individual liability in educational discrimination cases.[14]

Johnson does not respond to these Title IX and IHRA arguments directly; instead, she focuses her response on an argument that Friis can still be liable under tort law for his actions that  occurred outside the scope of his employment, attempting to admit that several of his actions occurred off campus and after hours, making them "extracurricular." Plaintiff's Response, Docket No. 63, p. 11.   NIC also discussed these "extracurricular" activities in briefing, concluding that telephone calls made to Johnson during the Summer 2004 were outside the course and scope of Friis' employment.  Thus, Johnson claims, the Court's prior Memorandum Order (Docket No. 27) granting summary judgment in favor of Friis and NIC based on Johnson's undisputed failure to comply with the Idaho Tort Claims Act does not bar her claims against Friis that are based on his actions that occurred outside the scope of his employment.   Friis replied, claiming that all state tort claims were dismissed and also by addressing each state law claim in an attempt to demonstrate summary judgment should be granted.  Friis' Reply, Docket No. 73.

---

[14] This conclusion is also consistent with the Idaho Supreme Court's adoption of Title VII case law that does not allow for individual liability under the IHRA. *Foster v. Shore Club Lodge, Inc.*, 127 Idaho at 925-6.

**REPORT AND RECOMMENDATION - 20**

The Court agrees with Johnson, that separate from the ITCA, tort claims against Friis as an individual might be appropriate if any of Friis' actions upon which those claims were premised occured outside the course and scope of Friis' employment with NIC.[15]  However, the Court need not address this issue here, as the Court finds Johnson's attempt to raise new claims in this litigation in her Response to NIC's and Friis' Motions for Summary Judgment is improper.[16]

In her Amended Complaint (Docket No. 25), Johnson does not allege that any of Friis' actions occurred outside the course and scope of his employment, nor does she allege that Friis should be individually liable for those actions.   Instead, the tort claims in her Amended Complaint allege Friis acted wrongfully and that NIC should be liable for those actions.  For example, the causes of action for battery and assault both state: "Defendant NIC is liable for Defendant Friis' conduct as set forth in this complaint" without similarly stating that Friis is individually liable for acts that occurred outside the course and scope of his employment.  Amended Complaint, Docket No. 25,¶¶ 8.5, 9.3.  Additionally, the causes of action for negligent and intentional infliction of emotional distress begin by stating: "[b]y engaging in the conduct described above, Defendants acted..." Amended Complaint, Docket No. 25, ¶¶ 5.2, 6.2.  As the conduct described in the Amended Complaint was never identified nor alleged to have occurred outside the course and scope of Friis' employment with NIC, Johnson did not state any claim for individual tort liability on conduct allegedly committed by Friis that was outside the course and scope of his employment with NIC.  Johnson's attempt to raise such claims through argument in

---

[15]The ITCA provides that "A governmental entity shall provide a defense to its employee, including a defense and indemnification against any claims brought against the employee in the employee's individual capacity when the claims are related to the course and scope of employment.  I.C. §6-903.  If further provides that, for the purposes of this act and not otherwise, it shall be a rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment and without malice or criminal intent." I.C. §6-903(e).

[16]The Court also questions whether such claims against Friis would have been timely under I.C. §5-219 if filed in the original Complaint on September 26, 2006, given the dates of Friis alleged tortious conduct that Johnson now claims was outside the course and scope of his employment.  However, as neither party raised this statute of limitations issue, it will not be considered herein.

**REPORT AND RECOMMENDATION - 21**

her briefing in response to Defendant NIC's and Friis' Motions for Summary Judgment simply does not amend her Amended Complaint.

Johnson's current argument that some of Friis' actions were outside the course and scope of his employment is absent from the allegations in Johnson's pleading, as well as from the briefing Johnson submitted in Response to the Defendants' Motion to Dismiss based on Johnson's failure to provide notice under the ITCA (Docket No. 10).  Instead, as framed, Johnson's tort claims were all encompassed by the ITCA and neither the defendants nor the Court were placed on notice that Johnson contended Friis was liable, wholly separate and apart from NIC, based on conduct outside the course and scope of his employment.  Therefore, all of the tort claims alleged against both Defendants in the Amended Complaint were dismissed by the Memorandum Decision and Order (Docket No. 27) and there are no tort claims remaining against Friis for the Court to address in deciding the defendant's motions for summary judgment.

## RECOMMENDATION

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY RECOMMENDED** that:

1)      NIC's Motion for Summary Judgment  (Docket No. 49) and Donald Friis' Motion for Summary Judgment (Docket No. 51) be granted.

DATED: August 8, 2008

Honorable Candy W. Dale
United States Magistrate Judge

**REPORT AND RECOMMENDATION - 22**